**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**GLEN JOSEPH DAVIS**                                              **PETITIONER**

**VERSUS**                          **CIVIL ACTION NO. 1:20-cv-158-HSO-MTP**

**JOE ERRINGTON**                                                  **RESPONDENT**

## REPORT AND RECOMMENDATION

BEFORE THE COURT is a Petition for Writ of Habeas Corpus [1] pursuant to 28 U.S.C. § 2254 filed by Glen Joseph Davis ("Davis"). Having considered the submissions of the parties, the record of the state proceedings, and the applicable law, the undersigned recommends that the Petition [1] be DENIED.

## FACTS AND PROCEDURAL HISTORY

On August 18, 2015, Davis was convicted in the Circuit Court of Hancock County, Mississippi of murdering Maurice Colly. ([16-9] at 19-20). Because the conviction was based on circumstantial evidence, the Mississippi Court of Appeals provided an extensive factual background in its unanimous opinion affirming the conviction. *See Davis v. State*, 243 So.3d 222 (Miss. Ct. App. 2017). The following factual summary is taken from the Court of Appeal's opinion.[1]

---

[1] Unless otherwise noted, the "Background Facts" are quoted directly (including footnotes) from the Court of Appeals opinion in *Davis v. State*, 243 So.3d 222 (Miss. Ct. App. 2017). The direct quote begins here on page 2 and ends on page 19 of this Report and Recommendation. Davis does not challenge the Court of Appeal's factual summary in his Petition [1]. However, the undersigned has nevertheless undertaken to confirm the factual synopsis with references to the record in this case. The record references were added by the undersigned.

**Background Facts**

On March 8, 2012, eighty-three-year-old Maurice Colly was found dead in the trunk of his car in the garage of his Bay St. Louis home. Colly's wrists and ankles were bound, and his head was wrapped in a pillow case, plastic bag, and painter's cloth, and he had sustained blunt-force injuries to his face, scalp, and shoulders. ([16-18] at 142-146).

Davis was identified as a suspect in the homicide. He was arrested in Michigan after the case was featured on the television show America's Most Wanted. ([16-21] at 108-110). He was indicted for the murder, and his case proceeded to a seven-day jury trial in the Hancock County Circuit Court. Twenty-nine witnesses testified at trial, and over one hundred exhibits were admitted into evidence. ([16-16] at 2-13).

*The State's Case*

In March 2012, Colly owned and lived in a two-story building on Second Street in downtown Bay St. Louis. Colly's residence, where he lived alone, occupied the entire second floor of the building. The ground floor of the building consisted of three two-bedroom apartments, which Colly rented to tenants, and a garage, which was connected by interior stairs to Colly's residence. The garage could not be accessed from any of the first-floor apartments. ([16-18] at 87-94). Colly was eighty-three years old and a bachelor. His closest living relative was his nephew, Wally, who lived in Atlanta.([16-18] at 35-59).

On Wednesday, March 7, 2012, around 11 a.m., a friend of Colly's, Charlotte Taylor, called the landline telephone at Colly's apartment. Someone with a nasally voice answered, said that he did not feel like talking, and hung up. Taylor testified that the person did not sound like Colly, but at that point she had no reason to doubt that it was Colly, and she thought that he

might just be sick and not feeling well. Taylor called Colly's phone several more times that day with no answer. ([16-18] at 40-41).

Colly still did not answer when Taylor called again the next morning (March 8), so she drove to his home to check on him. No one answered when she knocked on the door around 10:30 a.m., so she talked to one of Colly's neighbors and then called Colly's nephew, Wally. Wally suggested that she call Colly's cell phone, which, according to Taylor, Colly rarely used. Taylor was surprised when "a strange voice answered" Colly's phone. The person said, "we're going after the plants," and then hung up. Taylor thought that "the plants" might have been a reference to some landscaping that Colly had planned for his yard. However, by this point, she and the neighbor were very concerned and soon called the police. ([16-18] at 42-43, 63).

Officers from the Bay St. Louis Police Department arrived and conducted a welfare check of Colly's home. Officer Scott Armentrout recognized Colly's green Toyota Camry because it was the same car that he had seen parked at a nearby library at 6:30 p.m. the night before. A caller had reported the car as "suspicious," so Armentrout had gone to the library to investigate. He found the car backed into a parking spot next to a garbage dumpster with its windows down and a dark-colored mountain bike on the backseat. Armentrout did not do anything else about the car that evening, but he noticed that it was still parked in the same place when he drove by the library around 3 a.m. When officers found the car parked in Colly's garage, its windows were up and the bicycle was gone. ([16-18] at 76-78).

Officers also noticed that a display case in Colly's living room was empty. Taylor told them that Colly kept a collection of plates depicting the Ten Commandments in the case. She later testified that Colly was very proud of the plates and never would have given them away. ([16-18] at 47-49).

3

The police eventually discovered Colly's body in the trunk of his car. Colly's wrists and ankles were bound, his head was wrapped in a pillow case, plastic bag, and painter's cloth, and he had sustained blunt-force injuries to his face, scalp, and shoulders. An autopsy determined that the causes of death were those injuries and asphyxiation. The state medical examiner testified that autopsy findings suggested that Colly died about forty-eight hours before his body was found—i.e., on or about March 6, 2012—although the medical examiner stated that this estimate was "not exact." ([16-18] at 142-146).

During their investigation, police determined that Colly had spoken to an employee at a doctor's office on the morning of Monday, March 5. The employee called Colly to confirm his appointment for the next day. She knew Colly and was familiar with his voice, and she was certain that she spoke with him that morning. ([16-19] at 2). In addition, records from Hancock Bank show that a deposit was made in Colly's bank account that morning. ([16-19] at 11).

Colly did not show up at his doctor's appointment at 10:00 a.m. on Tuesday, March 6. ([16-19] at 3). An employee of Hancock Bank testified that the bank received two phone calls requesting increases on the limits on Colly's ATM card. These calls were made on March 5 and March 6, although the record does not establish what times on those dates the calls were made. ([16-19] at 10).

Police obtained Colly's bank records and reviewed transactions around the time of his death and after his death. On March 6, at 10:12 a.m., 10:13 a.m., and 10:14 a.m., someone used the drive-thru ATM at Hancock Bank in Bay St. Louis to make successive withdrawals of $500, $500, and $400 from Colly's account. ([16-19] 11-12). Video and still photos from a camera at the bank show that the person was driving a car like Colly's light green Toyota Camry. The driver appeared to be wearing a blue shirt with a white floral design and possibly a Panama Jack-

style hat, but the car's sun visor was positioned so as to obscure the driver's face. At 10:21 a.m. and 10:22 a.m., someone attempted to use Colly's Keesler Federal Credit Union ATM card to make a withdrawal at Hancock Bank. And at 10:29 a.m., someone attempted to use Colly's Keesler card at an ATM at the People's Bank in Bay St. Louis. The attempts to use the Keesler card were all unsuccessful. ([16-19] at 28-29). Photos taken at the People's Bank appear to show the same car, but the sun visor was again positioned so as to obscure the driver's face. As discussed in more detail below, Colly's Hancock Bank card was used once more on March 9, 2012, at 2:37 a.m., to withdraw $400 from a drive-thru ATM in Gulfport. Video showed a different car, a silver Honda Accord. The car's sun visor was again positioned to obscure the driver's face.

After Colly's body was discovered, the police and the Mississippi Bureau of Investigation collected various evidence from the garage and residence, which [the Court] will discuss below. The police then turned the home over to Wally and his wife, Carol. Wally later noticed that a rectangular hole had been cut in the bottom of the exterior door to a storage room that was connected to Colly's garage. The cut-out piece had been taped back into the door from the inside. Wally showed the hole to Detective Gary Hudgens of the Bay St. Louis Police Department, and they found a cigarette butt in the storage room about three feet from the hole. Hudgens suspected that the hole was the murderer's point of entry into Colly's home. ([16-22] at 19-20).

In late April, in the course of cleaning Colly's home, Carol found a plastic Kmart bag behind the living room sofa. The bag contained medical tape, ace bandages, one blue glove, and gauze. The bag also contained a receipt showing a purchase of medical tape and bandages at 6:25 p.m. on March 7, 2012, at the Kmart on Highway 90 in Waveland. Carol knew that Colly was

dead by March 7, so she and Wally turned the bag over to Detective Hudgens. ([16-22] at 21-22). Detective Hudgens collected the bag and its contents as evidence, along with some cleaning rags, Lysol, and mineral spirits that were found near the bag. ([16-19] at 43-53). Wally and Carol also found an empty package for a salt-and-pepper wig in the living room, which they also turned over to police. ([16-22] at 22).

Kmart provided video footage of the transaction reflected in the receipt, and on April 27, 2012, the police released the video to the media, describing the customer as a person of interest in Colly's murder. The same day, multiple callers to Crime Stoppers identified Davis as the customer in the video. ([16-20] at 44). The cashier then identified Davis in a photo lineup. ([16-19] at 86). At trial, she testified that Davis seemed "nervous" while making the purchase. ([16-19] at 69).

At trial, four women—Jo, Jodi, Rene, and Lori—who met Davis on a dating website ("Plenty of Fish") testified about his whereabouts and actions in March and April 2012, beginning around the time of the murder. Jo testified that Davis called her around 9 p.m. on Monday, March 5, 2012, and asked her to pick him up at an Exxon station on Nicholson Avenue in Waveland. Jo picked up Davis, and they went back to her house in Waveland and then to a casino. According to Jo, they left the casino and returned to her house around midnight. She testified that around 2 a.m., Davis borrowed her car to go buy beer. She said that when Davis returned to her house around 3 a.m., she asked him why he had been gone so long, and he said that he had been talking to a friend. Jo then went to bed alone. ([16-20] at 17-19).

Jo testified that she next saw Davis for "a brief period of time" around 8 or 9 a.m. on March 6.[2] Jo did not see Davis again until she returned home from work at 11 p.m. that night. She testified that Davis left her house at some point that morning, but she did not know when he left, where he went during the day, or when he returned to her house. ([16-20] at 19). As discussed above, someone used Colly's ATM cards at banks in Bay St. Louis beginning at 10:12 a.m. that morning. Davis's cell phone records, which were admitted into evidence without objection, show that his cell phone utilized the Perniciaro Lane cell tower, which is near downtown Bay St. Louis, at 1:41 p.m. that afternoon. ([16-19] at 133-38).

Davis spent the night at Jo's house again on March 6, but at trial Jo could not recall what time of day he left on March 7 or anything else that occurred on March 7. ([16-20] at 32-33). The State presented no direct evidence of Davis's whereabouts during the day on March 7 until he made the above-discussed purchase at the Kmart in Waveland at 6:25 p.m. Also, as noted above, Officer Armentrout testified that Colly's car was parked with its windows down and a bicycle in the backseat at the library in Bay St. Louis from sometime before 6:30 p.m. on March 7 until at least 3 a.m. on March 8. ([16-18] at 76-77).

Around noon on March 8, Davis made a series of phone calls to taxi services. His cell phone utilized the Marti Street tower in downtown Bay St. Louis for those calls. Around 4 p.m., his cell phone utilized a cell tower in Biloxi, and around 6 p.m., his cell phone utilized cell towers in Saucier and Gulfport. ([16-19] at 137-139). Jodi testified that on March 8 Davis texted her throughout the day asking her to meet him for a drink that evening. He continued to text her

---

[2] On cross-examination, Jo said that she drank coffee with Davis on her porch, possibly until 10:30 or 11 a.m.

after she got home from work, so she finally agreed to meet him between 7 and 8 p.m. at Michael's, a bar on Highway 49 in Gulfport. ([16-19] at 98-99).

Jodi testified that when she met Davis at Michael's, "[h]e was dressed a little different from his norm." He was wearing what she considered to be "an older gentleman's shirt and an older gentleman's hat that he wouldn't typically wear." She "picked on him about" his clothes, and "he got a little bit offended." After they had one drink at Michael's, Davis asked her to take him to Walmart to buy new clothes, and he bought a t-shirt and a baseball cap. Next, they went to the Days Inn on Highway 49 in Gulfport. Davis asked Jodi to go to the front desk to get the room, but he gave her cash to pay for it. Davis changed into his new clothes, and around 9:30 or 10 p.m., they went to the Island View casino in Gulfport. Davis bought drinks for Jodi, and she testified that Davis "had more money than he'd ever had [when they had] gone out." Davis and Jodi were at the Island View for about two hours. ([16-19] at 99-102).

From the Island View, Davis and Jodi went to Nate's Sports Bar on Highway 49 in Gulfport. At trial, Davis admitted that while he and Jodi were at Nate's, he left briefly in her car and drove to a nearby bank. At 2:37 a.m., he used Colly's ATM card to withdraw $400. The withdrawal was recorded on the bank's video camera. Jodi did not know that Davis left the bar and did not give him permission to use her car. Jodi explained that they met several of her friends at Nate's, and she did not keep track of Davis the entire time they were there. She testified that she and Davis left Nate's together around 3 a.m. on March 9 and returned to the Days Inn. ([16-19] at 106-08).

The State did not present any further testimony about where Davis went or what he did on March 9, 2012. Davis's cell phone records suggest that he was in Gulfport, as there were a

number of calls placed from his phone between noon and 6:20 p.m. that utilized Gulfport cell towers.

On the afternoon of March 10, 2012, Davis and Rene drove to New Orleans in Rene's car. ([16-20] at 2-4). Rene testified that Davis did not have a car of his own at the time, so he relied on his bicycle, which was a dark color, or others for transportation. ([16-19] at 144). Davis and Rene stayed in New Orleans only a brief time and returned to her house in Ocean Springs the same day. ([16-20] at 2-4).

At some point in March 2012, Davis brought a number of silver-plated dishes, an ornamental knife, a pewter submarine, and other items to Rene's house.[3] Rene helped polish some of the items. Davis told her that he had inherited the items from his grandfather, and he left them at her house. ([16-19] at 145-146). However, Wally testified that the items belonged to Colly. ([16-22] at 24).

Around March 26 or 27, 2012, Davis called Lori and told her that he was at her apartment in Ocean Springs and that he had some things that he wanted to leave there. Lori agreed, and Davis left a plastic storage bin and two cardboard boxes outside her apartment. When she later moved the bin and boxes, Lori noticed that they contained ornamental plates and a crystal vase, among other items. At trial, Lori identified the plates as Colly's prized Ten Commandments plates, and she identified the vase as one that Wally testified belonged to Colly. ([16-20] at 6-13).

As discussed above, on April 27, 2012, police released the Kmart video to the media, and Davis was identified as the customer. The same day, Davis asked Jo if he could borrow her car to check on his father, who he said was injured. Jo agreed but asked Davis not to keep the car long.

---

[3] Rene could not remember when in March this incident occurred.

Davis never returned Jo's car or spoke to her again. ([16-20] at 19-27). Davis also called Lori and asked if he could retrieve his storage bin and boxes from her apartment. Lori testified that Davis "was in a hurry" when he came to her apartment and left quickly. ([16-20] at 11-12).

Detective Hudgens learned that Davis had been staying at his father's house in Kiln. ([16-20] at 44). Davis's father, Larry, consented to a search of Davis's room, and Detective Hudgens collected a pair of Asics tennis shoes as evidence.[4] ([16-20] at 50-51). Jimmy Perdue, a forensic scientist at the Mississippi Crime Lab, determined that the shoes matched three footprints (one right and two left) on a large plastic sheet that was under Colly's body in the trunk of his car. Perdue testified that the footprints and the shoe were consistent with respect to "physical size, shape, outsole design, and some general wear characteristics." ([16-22] at 5-6).

In August 2012, the United States Marshals Service received information that Davis was in Walker, Michigan, a suburb of Grand Rapids, where Davis had once lived. Law enforcement spotted Davis riding a bicycle and arrested him after a short chase. At the time of his arrest, Davis was wearing a salt-and-pepper wig. ([16-21] at 108-110).

While in jail in Michigan, Davis received a call from a friend ("Sue"), which the local sheriff's department recorded. Davis told Sue that he was "busted," that he was "in some hot water," and that he was "not innocent." Davis also complained that "everybody despised" Colly, but the media had "put him up on a pedestal." ([16-24] at 29).

The local sheriff's department learned that Davis had abandoned Jo's car at an apartment complex in the city of Wyoming, Michigan, another suburb of Grand Rapids. The car's Mississippi license plate had been replaced with stolen Michigan plates. Colly's Ten

---

[4] In his testimony at trial, Davis denied that the shoes were his. However, Hudgens testified that they were found in Davis's room and that Larry acknowledged that the shoes were Davis's.

Commandments plates, his ornamental knife, and other property belonging to Colly were all found hidden in the wheel well of the car. ([16-21] at 120-25).

The State's case-in-chief also included expert testimony regarding the forensic analysis of several pieces of evidence collected at Colly's residence. First, Davis's middle fingerprint matched one of two latent fingerprints taken from the driver's doorhandle of Colly's car. ([16-21] at 139). Second, Davis's DNA was on the cigarette that Detective Hudgens found in the storage room near the hole in the door. ([16-21] at 76). Third, Davis's DNA was on the inside of a blue glove found in the Kmart bag. ([16-21] at 80). Colly was excluded as the source of other DNA found on the glove, and Davis and Colly were also excluded as sources of a small amount of blood on the glove, which was described as only a "weak indication of a presence of blood." ([16-21] at 93-94). Fourth, two different persons' DNA was found on the gauze and bandages found in the Kmart bag. Davis and his patrilineal relatives could not be excluded as a source of some of the DNA. Colly and his patrilineal relatives could not be excluded as a source of other DNA on the same gauze and bandages. ([16-21] at 97-99).

Finally, Detective Hudgens also collected a shirt from Colly's closet with a pattern that appeared similar to the shirt worn by the person captured on video using Colly's ATM card on March 6. Both Davis and Colly could not be excluded as contributors of DNA found on and inside the shirt. ([16-21] at 67).

### *Davis's Defense*

[The Court will] begin discussion of Davis's defense with Davis's own testimony. Davis testified that he had known Colly since 2007, that he did odd jobs for him as a handyman, and that he "considered him a friend." ([16-23] at 69). In November 2011, Davis and his father, Larry, were doing some work at a property next door to Colly's home, and Colly offered to let

Davis borrow a ladder. Colly told Davis to move his (Colly's) car before attempting to remove the ladder from the garage, so Davis backed the car onto the driveway and drove it back into the garage after he was finished with the ladder.[5] ." ([16-23] at 72-74).

Davis testified that he cut the hole in Colly's storage room door in February 2012. He claimed that Colly asked him to cut the hole because Colly was considering installing a vent in the door. Davis had ridden his bicycle to Colly's home, so he borrowed Colly's car to retrieve his Sawzall (a reciprocating saw) from his storage unit. Davis testified that he had driven Colly's car with Colly's permission on a number of occasions. After he finished cutting the hole, Davis used tape to replace the cut-out piece because Colly had not purchased a vent for the door yet. Davis left the Sawzall at Colly's house, and at trial he pointed it out in a picture of Colly's garage. He also smoked a cigarette that day, so he was not surprised that a butt with his DNA on it was found in the storage room. ([16-23] at 76-81).

Davis testified that the same day he cut the hole in the storage room door, Colly hired him to put up some drywall and paint in Colly's residence and garage. Davis agreed to do the work for $480. Colly asked Davis to do the job between March 5 and March 12 because Colly planned to be out of town that week. ([16-23] at 92-97).

Davis testified that he next stopped by Colly's house on Saturday, March 3, 2012. Colly still did not have a vent for the door. Colly said that he would leave his ATM card for Davis in case Davis needed it to buy paint for the job. Colly also left a garage door opener in a planter outside of the garage for Davis to use to access the garage and residence. ([16-23] at 100-02).

---

[5] Larry similarly testified that in November 2011 he and Davis borrowed Colly's ladder and Davis moved Colly's car.

Davis next testified about his whereabouts on Tuesday, March 6, 2012. He woke up at Jo's house in Waveland around 8:30 or 9 a.m. He then had coffee with Jo, worked on her lawnmower, and mowed her back yard. Davis claimed that he did not leave Jo's house until Larry picked him up there around 12:30 p.m. Davis and Larry drove back to Larry's house in Kiln, which was where Davis primarily lived at the time. Davis then borrowed Larry's truck to meet Oliver Cuevas for lunch in Bay St. Louis.[6] ([16-23] at 103-08).

Davis picked up Cuevas at Walmart, where Cuevas worked, and they ate lunch at KFC. After lunch, Davis drove Cuevas back to Walmart and dropped him off a few minutes before 3 p.m.[7] Davis then went to pay his cell phone bill and to get a new driver's license to replace one that he had lost.[8] Around 5 p.m., Davis drove back to Larry's house in Kiln. He was at Larry's house for about an hour before he "headed to Hattiesburg to see a girl" (another woman he met on Plenty of Fish). Just as Davis was arriving in Hattiesburg around 7 or 7:15 p.m., the woman called to cancel their date. Davis ate at Wendy's, went to Home Depot, and then drove back to Jo's house in Waveland. Davis arrived at Jo's house around 10:30 or 10:45 p.m., just before Jo got home from work around 11 p.m. ([16-23] at 109-25).

Davis testified that on March 7 he again woke up at Jo's house around 8:30 or 9 a.m. and had coffee with her. He then mowed her front yard, washed Larry's truck, and left about 12:30 p.m. He drove to his storage unit for supplies to use at Colly's house. While he was at the storage

---

[6] Larry similarly testified that he picked Davis up in Waveland on March 6 and then allowed Davis to borrow his truck. Larry never provided this information to the police.

[7] Cuevas similarly testified that he ate lunch with Davis at KFC and was with him from approximately 1:45 p.m. to 2:50 p.m. Cuevas never provided this information to the police.

[8] Davis introduced a printout from the Department of Public Safety website that appears to confirm that he obtained a new license on March 6.

unit, he spilled a can of paint, and it took him over an hour to clean up the mess. He then ate lunch at Subway. "While [Davis] was at Subway, a friend [(Liz)] texted and wanted some cough medicine. So [he] left to go look for some cough medicine at CVS or Walgreens." Liz was "very particular" about her cough medicine—it had to be a specific brand, size, and flavor. Neither CVS nor Walgreens had the right kind, so Davis drove to Rouses Market in Diamondhead, where he finally found it. Davis then drove back to Larry's house in Kiln. He arrived at Larry's around 4 p.m. and then mowed Larry's yard. ([16-23] at 127-33).

After he mowed Larry's yard, Davis drove back to Bay St. Louis and then went to Kmart in Waveland, where at 6:25 p.m. he made the purchase discussed above. Davis testified that he bought bandages at Kmart to wrap old shoulder and elbow injuries that bothered him when he painted. He also testified that the cashier asked him why he needed the bandages, and he made a joke referencing a Seinfeld episode in which the characters Kramer and Mickey got acting jobs portraying illnesses for medical students to diagnose.[9] According to Davis, the cashier did not get the joke. However, the cashier testified that she did not remember him making a joke. After leaving Kmart, Davis went back to his storage unit for more supplies and then drove to Colly's home to begin work. ([16-23] at 133- 37).

Davis testified that when he arrived at Colly's home around 7 p.m., the door from the garage to Colly's residence was open, lights were on upstairs, and he could hear a woman's voice and the television. Davis put on gloves and wrapped his elbow and shoulder to start work. But he decided to go upstairs first. When he did, he saw a blonde woman whom he had seen at Colly's home once before. Davis introduced himself and told the woman that he was there to paint. At the time, Davis did not know the woman's name, but at trial he identified her from a

---

[9] Seinfeld: The Burning (NBC Television broadcast Mar. 19, 1988).

photograph as Carol Babb. Davis found it "odd" that Babb was in Colly's home when Colly was supposed to be out of town, and he felt that "[s]omething wasn't right." Davis also saw a man with Babb. At the time, Davis did not know the man's name, but at trial he identified him from a photograph as Otis Stewart. Davis did not say much to either Babb or Stewart. The situation was "awkward," so Davis went out to the balcony to smoke a cigarette and to decide what to do. Davis apparently left one of his gloves and his bandages in the Kmart bag in the living room. ([16-23] at 138-48).

While he was on the balcony, Davis "heard a door slam," and he thought that Stewart had departed. However, Babb was still inside. After waiting on the balcony about twenty minutes, Davis decided that he should leave. He went back downstairs to the garage. He took his cigarette butt with him, but he forgot to pick up the Kmart bag. Davis took Colly's ATM card from his Sawzall case, which was still in the garage. Davis testified that he did not have possession of the ATM card until he took it from the Sawzall case as he left Colly's house that evening.[10] Davis then closed the garage door and left in Larry's truck. Davis took Liz's cough medicine to her at her house in Bay St. Louis and then drove to Larry's house in Kiln. He arrived at Larry's house around 9 p.m. and spent the night there. ([16-23] at 146-48).

On March 8, Davis asked Larry to drive him back to Liz's house in Bay St. Louis, and Larry dropped him off there around noon. Davis testified that he needed to pick up "a shirt or something" at Liz's house. He only spoke to Liz for "[t]wo minutes," as "[s]he was in her bed on her back." He was at Liz's house for only five or ten minutes before he began trying to call a taxi because he "was going out" and "needed a ride." He eventually found a taxi, and the driver took him to the Island View. ([16-23] at 150-51)([16-24] at 2-3).

---

[10] Davis denied that he used the card in the morning on March 6.

Davis had lunch at the Island View. He texted Rene and asked her to meet him. She met him at the Island View around 1:30 p.m. but could only stay until 3 p.m. Rene then gave Davis a ride to the Hard Rock casino. Davis was at the Hard Rock only about ten minutes before he called another taxi. Davis explained that he was carrying his backpack, "which goes where [he] go[es]," but "they don't check bags" at the Hard Rock, so he could not stay for cocktails, as he had planned. The taxi dropped Davis off at Walmart on Highway 49, and he eventually walked to a Mexican restaurant while he waited for Jodi to get off of work. ([16-24] at 4-6).

Davis testified that he met Jodi at Michael's bar, and his account of the evening was generally consistent with Jodi's testimony—i.e., they went to the Days Inn, the Island View, Nate's, and eventually back to the Days Inn. Unlike Jodi, Davis did not testify that she took him to Walmart to buy new clothes. Davis acknowledged that while he and Jodi were at Nate's, he left briefly in Jodi's car and used Colly's ATM card to withdraw $400 from an ATM. Davis considered this prepayment for the drywall and painting job that he still intended to finish at Colly's home. ([16-24] at 6-10).

According to Davis, Jodi left around 8 a.m. the following morning (March 9), but he slept late. After he woke up, he went to the front desk and paid cash for another night. "And that night, [he] did it all over again with another girl"—namely, Rene. Davis testified that he met Rene around 9 p.m. at the Island View, and they stayed there "for a few hours" and "then hit the rest of the town." He testified that he and Rene "stayed up all night" together, presumably returning to the Days Inn at some point. ([16-24] at 10-13).

Davis testified that the next day—Saturday, March 10—he and Rene drove to her house in Ocean Springs. Consistent with Rene's testimony, Davis testified that he and Rene drove to

New Orleans in the afternoon but stayed only a short time before returning to Ocean Springs.[11] According to Davis, his father texted him while they were in New Orleans and told him that Colly was dead. This "upset" Davis because Colly was his "friend." Davis spent the rest of the weekend at Rene's house. ([16-24] at 13-17).

The next week, Davis got a new phone and quit using his old phone. He was "freaking out" that he would be accused of the murder, but he did not go to the police to tell them about Babb and Stewart. As will be discussed in more detail below, Babb and Stewart were identified as suspects in the murder, and for a time Davis thought "everything would get worked out." From March 11 to April 27, Davis "picked up and carried on with [his] life" and tried to act as though everything was normal. ([16-24] at 19-20).

Davis testified that his father or "somebody" texted him on April 27 and told him that he was on the news in connection with Colly's murder. Davis claimed that he borrowed Jo's car before he learned that the police were looking for him. He denied that he borrowed the car with the intent "to flee." He testified that he fled because he was wanted for questioning and because he "had some things of [Colly's]," including the Ten Commandments plates. Davis claimed that Colly had given him the plates and other items. ([16-24] at 22-25). He denied that he stole anything from Colly. Davis claimed that other items found in his car did not belong to Colly and that Wally and Taylor were mistaken or lying when they testified otherwise. ([16-24] at 41).

---

[11] Rene did not testify that she met Davis at the Island View on March 8. Nor did she testify that she went to a casino, "hit the town," "stayed up all night," or stayed at the Days Inn with Davis on March 9-10, 2012. The State called Rene as a witness, and on cross examination Davis questioned her about their trip to New Orleans on the afternoon of March 10. However, Davis did not question her about the time they allegedly spent together on March 8, March 9, or the morning of March 10.

Davis fled to Chattanooga, Tennessee, and then drove to Michigan, where he had grown up. ([16-24] at 25). At trial, Davis testified about the recorded phone conversation from the Michigan jail. He claimed that when he told "Sue" that he was "not innocent," he meant only that he "took a car" and "lied to get that car." ([16-24] at 29). Davis testified that he did not murder Colly. He admitted that his testimony at trial was the first time that he had disclosed his claim that he saw Stewart and Babb at Colly's house the night of March 7, 2012. ([16-24] at 48-49).

In support of his theory that Babb and/or Stewart murdered Colly, Davis called Sindi Rogers as a witness. Rogers managed the Manor House apartments, which were located behind Colly's residence and apartments. Babb and Stewart had separate apartments at the Manor House in March 2012. Rogers testified that Babb and Stewart broke their leases by moving out of their apartments without notice in March 2012. She also testified that both Babb and Stewart left behind personal property, including some clothes and furniture, and that Stewart typically rode a bicycle. ([16-22] at 76-90).

Davis also called Joe Kepfer, a former detective with the Bay St. Louis Police Department. Kepfer had been one of the lead investigators on the Colly murder, but his employment was terminated early in the investigation. Kepfer testified that he was fired after he was accused of making false statements in connection with applications for search warrants in this case. However, Kepfer denied making any false statements. ([16-23] at 7-33).

Kepfer initially considered Stewart and Babb the primary suspects in the murder. Kepfer testified that the "information [he] had was that [Babb and Stewart] moved out of their apartments without notice to the apartment manager in the middle of the night" on March 7-8. Stewart and Babb were detained in Louisiana on charges of credit card fraud, and Kepfer

interviewed them in Louisiana. Kepfer and other officers working the case eventually concluded that Stewart and Babb were not involved in Colly's murder. Kepfer was not involved in or familiar with the any part of the investigation after his suspension from the police department, which occurred about two weeks after the murder. ([16-23] at 26-41).

One of Colly's downstairs tenants, Latonja Ervin, also testified as a defense witness. Ervin testified that on March 6, 2012, she was in front of the building about to leave for work when she saw Colly's car drive down the street and pull into Colly's garage. She thought that this occurred between 8:30 and 9 a.m., but she was not positive about the exact time. Ervin testified that the car pulled into the garage faster than normal. She also testified that the driver was wearing a green coat and hat, his arms were "straight out and stiff," and he did not return her waive, which was unusual. Ervin did not get a good look at the driver's face, so she was unsure whether Colly was driving. Ervin also thought that she saw a "shadow" in the car like there could have been another person in the car, but she was not sure. ([16-22] at 57-66).

Davis attempted to call one other witness—Paula Jacobson—in support of his theory that Babb and/or Stewart murdered Colly. However, as will be discussed in more detail below, the trial judge excluded Jacobson's testimony because Davis failed to disclose her as a witness until well after the State had rested its case-in-chief. Defense counsel stated that his "only reason" for calling Jacobson was that she would testify that Babb knew Colly.[12] ([16-22] at 94-109).
*See Davis v. State*, 243 So.3d 222, 225-34 (Miss. Ct. App. 2017).

---

[12] This ends the factual summary quoted directly from the Court of Appeals opinion in *Davis v. State*, 243 So.3d 222 (Miss. Ct. App. 2017).

**Procedural History**

On August 18, 2015, Petitioner was convicted of deliberate design murder. ([16-9] at 19-20). He was sentenced as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections, without the possibility of parole or early release. ([16-9] at 19-20).

Petitioner appealed his conviction, but on April 14, 2016, Petitioner's counsel, submitted a brief stating that "pursuant to *Lindsey v. State*, 939 So.2d 743 (Miss. 2005), [] counsel diligently searched the procedural and factual history of this criminal action and scoured the record searching for any arguable issues which could be presented to the Court on Glen Joseph Davis' behalf in good faith for appellate review, and upon conclusion have found none." ([16-1]). Davis, however, filed a *pro se* supplemental brief on June 23, 2017 raising four grounds for relief:

> Issue 1: The wrongful conduct and or deliberate indifference by appeal attorney violated appellants rights guaranteed him by Sections 6, 14, 21, 24, 26, 33 of the Mississippi Constitution as well as violated appellants V, VI, IX, XIV Amendment rights guaranteed him by the United States Constitution.
>
> Issue 2: The wrongful conduct and deliberate indifference by trial attorney violated appellants rights guaranteed him by Sections 6, 14, 21, 24, 26, 33 of the Mississippi Constitution as well as violated appellants V, VI, IX, XIV Amendment rights guaranteed him by the United States Constitution.
>
> Issue 3: The wrongful conduct and or deliberate indifference by one or both trial prosecutors violated appellants rights guaranteed him by Sections 6, 14, 21, 24, 26, 33 of the Mississippi Constitution as well as violated appellants V, VI, IX, XIV Amendment rights guaranteed him by the United States Constitution.
>
> Issue 4: The wrongful conduct and or deliberate indifference by trial judge violated appellants rights guaranteed him by Sections 6, 14, 21, 24, 26, 33 of the Mississippi Constitution as well as violated appellants V, VI, IX, XIV Amendment rights guaranteed him by the United States Constitution.

([16-1] at 7).

On October 3, 2017, the Court of Appeals affirmed Petitioner's conviction in a written opinion. *See Davis*, 243 So.3d 222. On February 13, 2018, Petitioner's Motion for Rehearing was denied. On May 10, 2018, the Mississippi Supreme Court denied Plaintiff's Petition for Writ of Certiorari, and on June 12, 2018, the Mississippi Supreme Court issued its Mandate. ([15-2]); ([15-3]). Thereafter, Petitioner sought leave from the Mississippi Supreme Court to file a motion for post-conviction collateral relief in the trial court in which he asserted the following grounds (as stated by the *pro se* Petitioner):

> Ground One: Petitioner was denied Due Process. The District Attorney (District 2) and Bay St. Louis Police Department deliberately withheld material exculpatory information and/or evidence from this petitioner in order to manipulate the trial and gain a conviction.
>
> Ground Two: Petitioner was denied Due Process. The District Attorney (District 2) and Bay St. Louis Police Department deliberately presented false testimony and/or deliberately committed acts of perjury in order to manipulate the trial and gain a conviction.
>
> Ground Three: Petitioner was denied Constitutional right to Effective Assistance of Counsel. The Defense counsel failed to summon and/or disclose witnesses. Defense counsel failed to investigate and/or interview potential witnesses and/or suspects.
>
> Ground Four: Actual Innocence.

([16-26] at 246-98).

The Mississippi Supreme Court denied Petitioner's application finding that Petitioner's due process claim lacked an arguable basis and that his ineffective assistance of counsel claim failed to satisfy the requisite prongs of deficient performance and prejudice outlined in *Strickland v. Washington*. ([16-26] at 2).

On May 1, 2020, Petitioner filed the instant Petition for Writ of Habeas Corpus [1], raising essentially the same four grounds for relief he asserted in his petition for post-conviction relief, but in a different order:

Issue One (1): Ineffective Assistance of Counsel- Defense counsel was ineffective for (a) failing to disclose the main defense witness and (b) failing to interview potential suspects.

Issue Two (2): Denial of Due Process—The District Attorney, prosecutors, and Bay St. Louis Police Dept. deliberately withheld material exculpatory evidence in order to manipulate the trial and gain a conviction.

Issue Three (3): Denial of Due Process—The District Attorney and prosecutors deliberately allowed state witnesses to put forth false testimony during the actual trial in order to gain a conviction.

Issue Four (4): Actual Innocence

([2] at 6-14).

On July 28, 2020, Respondent filed his Answer [15] alleging that Issues One, Two, and Three are "barred" from review because Petitioner failed to meet his burden by clear and convincing evidence that the state appellate courts determined the facts unreasonably. ([15] at 13-14). Respondent also argues that Issue Four fails to state a claim as Petitioner does not allege deprivation of a constitutionally-protected right. ([15] at 9).

## ANALYSIS

The standard of review to be applied by this Court for habeas claims is set forth in 28 U.S.C. § 2254(d), which provides that a federal court may not grant habeas relief unless the state court's adjudication of the claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

The "contrary to" clause applies when the state court fails to apply a legal rule announced by the Supreme Court or reaches a result opposite to a previous decision of the Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The "unreasonable application" clause applies when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id*. at 407-08. The "unreasonable application" inquiry is based on an objective standard, and "unreasonable" does not equate with "incorrect." *Garcia v. Dretke*, 388 F.3d 496, 500 (5th Cir. 2004).

Habeas corpus serves as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations omitted). A federal court does not "sit as a 'super' state supreme court" and may decide the issues presented by the habeas petition "only to the extent that federal constitutional issues are implicated." *Smith v. McCotter*, 786 F.2d 697, 700 (5th Cir. 1986).

***Issue One: Ineffective Assistance of Counsel- Defense counsel was ineffective for (a) failing to disclose the main defense witness and (b) failing to interview potential suspects.***

In Ground 1 of his Petition, Petitioner argues that his trial counsel provided him ineffective assistance. ([2] at 6). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court defined the standard by which an ineffective assistance of counsel claim in a habeas proceeding is to be measured. Pursuant to *Strickland*, Petitioner must show that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." 466 U.S. at 687; *see also Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (stating that satisfaction of the standard requires a showing that counsel's acts "fell below an objective standard of reasonableness").

To establish a deficiency, Petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id*. This Court's "scrutiny of counsel's performance must be highly deferential" and it must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689; *see also Moawad v. Anderson*, 143 F.3d 942, 946 (5th Cir. 1998) (observing that the court "gives great deference to counsel's assistance, strongly presuming that counsel has exercised reasonable professional judgment") (internal quotations and citations omitted).

"To meet the prejudice prong of the *Strickland* test, the defendant may not simply allege but must 'affirmatively prove' prejudice." *Bonvillain v. Blackburn*, 780 F.2d 1248, 1253 (5th Cir. 1986) (citing *Celestine v. Blackburn*, 750 F.2d 353, 356 (5th Cir. 1984)). Petitioner must not only prove that the outcome of his trial would have been different "but for counsel's alleged errors," but must also prove that "'the result of the proceedings was fundamentally unfair or unreliable.'" *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). An ineffective assistance of counsel claim must be stated with specificity. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990). Summarily reciting general complaints about counsel's performance without discussing their specific basis or how application of the law purportedly justifies relief does not state a claim for habeas review. *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005); *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.")

In considering Petitioner's application for post-conviction relief, the Mississippi Supreme Court reviewed the claims of ineffective assistance of counsel and determined that Petitioner

24

failed "to satisfy the requisite prongs of deficient performance and prejudice outlined in *Strickland*…." ([15-4] at 1). Given that the ineffective assistance of counsel claims before this Court present a mixed question of law and fact[13] and that *Strickland* is the "clearly established Federal law" which governs such claims, the issue in Ground One is "whether the Mississippi Supreme Court's decision to reject [Petitioner's] ineffective assistance claim[s] 'involved an unreasonable application' (and not merely an incorrect application) of *Strickland*." *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002). The "'pivotal question' in a § 2254 proceeding 'is whether the state court's application of the *Strickland* standard was unreasonable,' an inquiry which 'is different from asking whether defense counsel's performance fell below *Strickland*'s standard.'" *Graves v. Banks*, 2020 WL 6791086, at *4 (S.D. Miss. May 14, 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

*(a) Testimony of Paula Jacobson*

In his first allegation of ineffective assistance, Petitioner argues that his trial attorney's failure to disclose Paula Jacobson as a witness to the prosecution prior to trial and the resulting exclusion of Jacobson's testimony violated his right to effective counsel. *See* [2] at 7. The trial court would not allow Jacobson to testify because Petitioner's counsel did not disclose her as a witness until the day he expected to call her to testify. ([16-22] at 105). Mississippi's then applicable Uniform Rule of Circuit and County Court 9.04[14] required the defendant to promptly disclose names and addresses of any witnesses in chief the defendant intends to offer at trial

---

[13] *Nixon v. Epps*, 405 F.3d 318, 324 (5th Cir. 2005) ("[T]he ultimate question of effective assistance of counsel is a mixed question of law and fact….").

[14] The content of the Uniform Rules of Circuit and County Court Rule 9.04 can now be found in Rule 17 of the Mississippi Rules of Criminal Procedure.

along with a copy of the contents of the statement they are expected to make. Once counsel for the prosecution became aware of defense counsel's intent to call Jacobson to testify, they requested time to speak to Jacobson and determine the content of her expected testimony. ([16-22] at 98). After speaking with her, the prosecution moved to strike her testimony since defense counsel knew of her expected testimony for several months and did not disclose it to the state. ([16-22] at 99).

Petitioner's trial counsel stated that Jacobson was "a rebuttal witness as [he] perceived it." ([16-22] at 101). Trial counsel for Davis also claimed that he did not have a duty to give the prosecution Jacobson's information since the prosecution's discovery documents made him aware of her existence. ([16-22] at 102). The trial court, however, found that counsel should have disclosed Jacobson as a witness and excluded her testimony on that basis.

"[E]ven if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). In order to find counsel's performance deficient under *Strickland*, it is not enough to find an error, but Petitioner must "affirmatively prove prejudice." *Bonvillain*, 780 F.2d at 1253. Thus, even if the Court assumes that Petitioner's trial counsel was deficient in not disclosing Jacobson as a witness, Petitioner still must prove that he was prejudiced.

The undersigned finds that Petitioner has failed to show that there was a reasonable probability that but for his trial counsel's failure to disclose Jacobson as a witness, he would not have been found guilty of Colly's murder. The content of Jacobson's expected testimony was attached to Petitioner's application for post-conviction relief. ([16-7] at 101-07). The six-page

document[15] indicates that Jacobson would have testified at trial that Babb and Stewart knew the victim, that Babb and Stewart had visited his property on unspecified occasions, and that she suspected Babb was having an affair was with the victim. ([16-7] at 104). At trial, after the defense moved to strike Jacobson's testimony, the trial judge confirmed with defense counsel that the only reason he intended to call Jacobson to testify was to establish that "Ms. Babb knew Mr. Colly and is the one that introduced [Ms. Babb and Mr. Colly]." ([16-22] at 109).

While Petitioner argues that Jacobson's testimony "would be enough to expose [his] innocence and that her testimony would expose a botched investigation and prosecution[,]" he makes no showing of how this would have changed the outcome of his trial. ([22] at 3). In fact, during trial Detective Joe Kepfer, a witness for the defense, was cross-examined about the investigation into and ultimate dismissal of Babb and Stewart as suspects to Colly's murder.

> STATE: Mr. Kepfer, at the end of the day once all the evidence was looked at, before any Crime Lab evidence was received, before any Crime Lab evidence could have been considered by the investigators, at that point based on what you knew about Carol Babb and Otis Stewart, you and all the other detectives at Bay PD determine that they were not a suspect in the murder of Maurice Colly; is that correct?
>
> KEPFER: Let's put it this way—
>
> STATE: Didn't you just testify to that?
>
> KEPFER: Yes, I did.
>
> STATE: What are you trying to say now?
>
> KEPFER: Let's put it this way, okay. John Mitchell and I were the ones that interviewed those folks. We came back and we told Chief DeNardo what we

---

[15] The document purporting to contain Jacobson's testimony is a signed letter dated October 21, 2016 (over one year after trial was completed). The page preceding the document indicates Jacobson personally appeared before a notary, provided a Mississippi driver's license, and acknowledged that she signed the document voluntarily. ([16-7] at 101). The copy of the "letter" in the record is of poor quality.

found out. He didn't want to believe it. And he did make those statements. Those were recorded statement.

STATE: Detective Kepfer, I just asked you a question. Did everyone come to the same conclusion after all the evidence was looked at?

KEPFER: Eventually.

([16-23] at 48-49). Detective Kepfer further testified that "[z]ero evidence in this case is linked to Babb or Stewart to the murder of Maurice Colly." ([16-20] at 94). Detective Kepfer's testimony shows that multiple officers considered Babb and Stewart as suspects but ultimately determined they did not commit Colly's murder. Furthermore, extensive evidence in the record supports Petitioner's conviction, and testimony from Jacobson that Babb and Stewart knew Colly and had certain suspicions would not have changed the outcome, nor does the exclusion of Jacobson's testimony render the outcome and proceedings unfair or unreliable.

A bag containing a receipt for medical tape and bandages purchased after Colly's estimated time of death was found in his house. ([16-22] at 21-22). Video footage of the purchase showed Davis as the customer, and he was identified in a photo lineup. ([16-19] at 86). Two witnesses at trial testified that Davis brought several items to their houses for storage that Colly's nephew Wally later identified as belonging to Colly. ([16-19] at 145-46); ([16-20] at 6-13). A forensic scientist determined that three footprints found on the plastic sheet under Colly's body in the trunk belonged to a pair of Asics shoes found in Davis's room. ([16-22] at 5-6). On the day that Davis was identified in the K-Mart video, he asked to borrow his friend's car and never returned it or spoke to her again. ([16-20] at 19-27). At the time of his arrest in Michigan, he was wearing a disguise. ([16-21] at 108-110). In a recorded call between him and a friend while he was detained in Michigan, Davis stated that he was "busted" and that he was "not innocent." ([16-24] at 29).

Davis has shown no real prejudice resulting from his attorney's actions. Counsel for

Plaintiff only planned to call Jacobson to testify to the fact that Babb and Stewart knew Colly.

([16-22] at 109). More importantly, the Mississippi Supreme Court reviewed and addressed the

issue, and its decision rejecting Davis's claim of ineffective assistance of counsel on this issue

was not an unreasonable application of the *Strickland* standard based on the evidence of record.

Therefore, habeas relief on this issue should be denied.

(b) *Failing to interview potential suspects*

Petitioner alleges that he received ineffective assistance of counsel because his trial

counsel failed to interview two of the initial suspects, Babb and Stewart. ([2] at 6). Petitioner

argues that "you cannot make an independent [sic] about the facts and circumstances of the case

without speaking to the two (2) main suspects." ([2] at 9). The Mississippi Supreme Court found

that Petitioner failed "to satisfy the requisite prongs of deficient performance and prejudice

outlined in *Strickland* …." ([15-4]).

"A defendant who alleges a failure to investigate on the part of his counsel must allege

with specificity what the investigation would have revealed and how it would have altered the

outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). To prevail on

such a claim, Petitioner must provide specific factual support as to what exculpatory evidence

further investigation would have revealed. *Id*. "Without specific, affirmative showing of what the

missing evidence or testimony would have been, a habeas court cannot even begin to apply

*Strickland*'s standards." *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994). Petitioner does

not point to any evidence in the record supporting what his trial counsel's investigation into

Babb and Stewart would have revealed.

Particularly since this court's "scrutiny of counsel's performance must be highly deferential" and it must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," the Court cannot find that Petitioner has overcome that presumption under the circumstances in this case. *See Strickland*, 466 U.S. at 689; *see also Moawad v. Anderson*, 143 F.3d 942, 946 (5th Cir. 1998) (observing the Fifth Circuit "gives great deference to counsel's assistance, strongly presuming that counsel has exercised reasonable professional judgment"). Based on the foregoing, the undersigned finds that the state court's holding that Petitioner failed to satisfy both prongs of the standards set forth in *Strickland* is not contrary to, or an unreasonable application of, *Strickland*. Habeas relief on this claim should be denied.

**Issue Two (2): Denial of Due Process—The District Attorney, prosecutors, and Bay St. Louis Police Dept. deliberately withheld material exculpatory evidence in order to manipulate the trial and gain a conviction.**

In Issue Two, Petitioner alleges that he was denied due process when the State did not disclose all of the information it had about Babb and Stewart or why John Mitchell and Joe Kepfer were terminated. ([2] at 10-12). The Mississippi Supreme Court reviewed Petitioner's due process claim and found that it "lacks an arguable basis." ([15-4]).

"The due process clause requires the state in a criminal prosecution to disclose evidence favorable to the defendant that is material to guilt or punishment." *Sims v. Mississippi*, 2020 WL 1221010, *8 (S.D. Miss. Jan. 28, 2020); *see also Brady v. Maryland*, 373 U.S. 83, 86-87 (1963). In order for petitioner to establish that his due process rights were violated, he "must show that the State withheld evidence, that the evidence was favorable, and that the evidence was material to the defense." *Avila v. Quarterman*, 560 F.3d 299, 305 (5th Cir. 2009). Evidence is material "if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

In support of his claim that the State withheld exculpatory evidence regarding the investigation into Babb and Stewart, Petitioner asserts that he "deserve[s] to know everything about the two (2) people seen inside the victims [sic] residence." ([2] at 13). However, Petitioner's allegation that Babb and Stewart were inside the residence on the day of the murder is only supported by Petitioner's own testimony at trial. ([16-24] at 47-49). When he took the stand, Petitioner stated for the first time that he saw two people in the house near the time of the murder. ([16-24] at 48). He admitted that this was the first time he mentioned the alleged sighting to anyone and that he did not call the police even after it was revealed that the victim was murdered. ([16-24] at 49).

Additionally, as discussed above, defense witness Detective Kepfer testified that he and Detective Mitchell interviewed Babb and Stewart and determined that they did not have anything to do with the murder. ([16-23] at 41-42). Detective Hudgens also testified at trial that an investigation was made into Babb and Stewart, but they found no connection between the couple and Colly's murder. ([16-20] at 96). Petitioner points to no specific evidence that he alleges was withheld, let alone whether it was favorable and material to his defense as required to support a claim for habeas relief. *See Avila*, 560 F.3d at 305 (5th Cir. 2009).

Petitioner also claims that his due process rights were violated when the State did not disclose the reason why Detective Mitchell and Detective Kepfer were fired. He alleges that "[t]here were recorded meetings about the controversy over the investigation" of Babb and Stewart and suggests that they were fired over the investigation. Again, Petitioner makes no showing as to what the alleged withheld exculpatory evidence even is, let alone whether this

evidence is favorable and material to the defense as required by Fifth Circuit precedent. *See Avila*, 560 F.3d at 305.

Petitioner generally states that "the case discovery was edited to redact and omit information and or evidence favorable to my defense." This allegation is unsupported, and the Court need not address unsupported assertions. *See Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir. 1983)("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.").

Petitioner has not shown that the State withheld favorable, material evidence. The undersigned finds that the state court's decision on this issue was not contrary to or an unreasonable application of clearly established federal law and, therefore, relief on this claim should be denied.

**Issue Three (3): Denial of Due Process—The District Attorney and prosecutors deliberately allowed state witnesses to put forth false testimony during the actual trial in order to gain a conviction**.

Petitioner alleges he was denied due process because the State allowed false testimony by witnesses at trial. ([2] at 9). He argued substantially the same ground in his application for post-conviction relief, and the Mississippi Supreme Court held that his claim lacked "an arguable basis." ([16-26] at 246-98; [15-4]).

In order for Petitioner to prevail on a denial of due process claim based on the prosecution knowingly using perjured testimony, or allowing untrue testimony to go uncorrected, Petitioner must prove that: "(1) the testimony was actually false, (2) the state knew it was false[,] and (3) the testimony was material." *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996).

Testimony is material if it could "in any reasonable likelihood have affected the judgment of the jury." *Giglio v. U.S.*, 405 U.S. 150, 154 (1972).

Petitioner alleges that "the prosecution let Det. Hudgens tell one lie after another" and "didn't stop to verify claims made against Det. Hudgens by Det. Kepfer." ([2] at 13). Petitioner argues that that these inactions show bad faith and resulted in a denial of his due process rights by creating an unfair trial. ([2] at 13). However, other than the above conclusory allegations, Petitioner does not allege a single specific statement of Hudgens' testimony that he claims was false. Instead, he references information Hudgens knew about that he did not testify to such as the search of Babb and Stewart's apartment as well as "the firings" of the two investigators. ([2] at 13). As Petitioner has not identified any testimony that was actually false, his claim cannot succeed. *Faulder*, 81 F.3d at 519.

For these reasons, the undersigned finds that the state court's denial of Petitioner's claim on this ground is not contrary to or an unreasonable application of clearly established federal law. Therefore, habeas relief on this claim should be denied.

### Issue Four: Actual Innocence

Petitioner alleges that the "new" evidence of Jacobson's testimony and the details surrounding the firing of Detective Mitchell and Detective Kepfer may prove that he is actually innocent. ([2] at 14). The Supreme Court of Mississippi found that Petitioner's claim "lacked an arguable basis. ([15-4]).

"[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Here, Petitioner does not assert that he is actually innocent as an attempt to overcome a procedural bar and no

procedural bar is indicated in this matter.[16] Instead, it appears that he is attempting to make an independent claim that he is innocent of the crime of which he was convicted. "'[A]ctual innocence' claims do not offer an independent basis for federal habeas relief…." *Jackson v. Day*, 121 F.3d 705 (5th Cir. 1997); *see also Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ("Our court does not consider habeas relief based on 'freestanding claims of actual innocence.'").

Because Petitioner has not asserted an independent ground for habeas relief by claiming actual innocence, the undersigned finds that the state court's decision was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to habeas relief on this ground.

## RECOMMENDATION

For the reasons stated above, the undersigned recommends that the relief sought in Glen Joseph Davis's Petition for Writ of Habeas Corpus [1] be denied and that the Petition be dismissed with prejudice.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules and 28 U.S.C. § 636(b)(1), any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the judge, the magistrate judge and the opposing party. The District Judge at the time may accept, reject or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation

---

[16] *See, e.g., Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) (newly discovered evidence including fingerprint-comparison results and DNA results, allowed the court to consider plaintiff's time-barred *Brady* claims).

within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

THIS the 16th day of June, 2021.

s/Michael T. Parker
UNITED STATES MAGISTRATE JUDGE